CHUCK WAGON CATERING, INC., Plaintiff-Appellant, v.
RADUEGE, Defendant-Respondent.

Supreme Court

*No. 76–449. Submitted on briefs February 28, 1979.—
Decided May 1, 1979.*
(Also reported in 277 N.W.2d 787.)

741

For the appellant the cause was submitted on the briefs of *Timothy K. Tollaksen* and *Herbert L. Usow, S.C.,* of Milwaukee.

For the respondent the cause was submitted on the brief of *Bryan A. Frame, II* and *Brenner, Brenner & Frame* of Waukesha.

DAY, J.   This is an appeal from a judgment of the circuit court for Waukesha County, the Honorable William E. Gramling, presiding, entered January 11, 1977, denying recovery to Chuck Wagon Catering, Inc. for breach of a restrictive covenant in a leasing agreement, except for $189.82 which defendant admitted owing plaintiff for purchases made by him.

The questions on appeal are:

1.   Is the restrictive covenant in the lunch wagon route leasing agreement enforceable?

2.   Did the trial court err in concluding that no cause of action for intentional interference with contract was proven?

3.   Was the trial court's finding that appellant was entitled to neither compensatory nor punitive damages erroneous?

Chuck Wagon Catering, Inc., a Wisconsin Corporation, lessor, brought this action against Warren Raduege, lessee, to recover liquidated damages, compensatory damages and punitive damages for the breach of a restrictive covenant in the lease agreement.

Chuck Wagon Catering, Inc., (hereafter Chuck Wagon) is engaged in the mobile catering business servicing Milwaukee and surrounding counties. The business consists of selling food and beverages from trucks to the employees of industrial plants and commercial establishments at scheduled times during the working day, usually at nearby parking lots. Norman C. Gilbert, president of

Chuck Wagon and manager of operations, testified that he established the particular lunch route in question and established relationships with customers which resulted in informal agreements that Chuck Wagon trucks would be allowed on the customers' property during breaks and lunch periods.

The route in question was serviced by Chuck Wagon employees for six years before it was leased, along with a truck to Mr. Raduege. On February 27, 1973, Raduege entered into an agreement with Chuck Wagon wherein he agreed, among other things, to pay fifteen dollars per day rental for the use of a truck and the route and to purchase all commodities used on the route from Chuck Wagon. The agreement provided that the route should remain the property of Chuck Wagon, and that as between the lessor and the lessee the route and identity of customer stops were to be regarded as a "trade secret." [1] In the agreement, Raduege agreed that for one year following termination of the contract he would refrain from engaging in the business of catering to customers on the lunch route which he was leasing. The agreement pro-

[1] Paragraph two of the lease provides in part as follows:

"2. Concurrently with the execution hereof, and as an integral part of this Lease Agreement, Lessor is delivering to Lessee a list of customer stops constituting a retail food route and disclosing to Lessee all pertinent confidential information concerning the type, nature, and amount of food and sundries purchased by customers at each stop. It is understood and agreed by and between both parties that said Lunch Route has been built and/or purchased, developed, and maintained by the Lessor at substantial expenditure of time, skill, energy, personal contact, and money; that said Lunch Route consisting of the identity of a number of customer stops thereon and the tastes, peculiarities, and requirements of individual customers at such stops has substantial monetary value, and is, and until sold shall remain, the property of Lessor; and further that said Lunch Route and identity of customer stops is conclusively regarded by Lessor and Lessee to be and is, as between them a trade secret."

vided that liquidated damages for breach of this covenant would be $2,500.[2]

Raduege testified that he was not given a written list of the customer stops on his route, but that a Chuck Wagon driver accompanied him his first three days on the job and pointed out the stops to him, at which time he wrote the addresses down himself. After he had been on the route for one year, Raduege bought his own truck, and the rent was reduced to nine dollars per day for the route alone by agreement between the parties. Raduege's profit came from the mark-up he got on the food and beverages he purchased from Chuck Wagon, the normal mark-up being fifty percent. Raduege continued to purchase his food and beverages from Chuck Wagon and to pay rental on the route until October 1, 1975 when, without notice to Chuck Wagon, he switched to another supplier and stopped paying rent for the route, though he continued to service it.

Mr. Gilbert testified that when he discovered that Raduege was servicing the route on his own, he sent one of his other drivers out on the route in a Chuck Wagon truck, but that customers continued to buy from Raduege rather than from the Chuck Wagon driver. Raduege testified that two Chuck Wagon trucks followed him on

---

[2] Paragraph fifteen of the Lease provides:

"15. Upon termination of this agreement, Lessee agrees, for and in consideration of the mutual covenants of the parties herein contained, that Lessee will not solicit or receive or attempt to solicit or receive, directly or indirectly, for the benefit of Lessee or others, for a period of not less than one year from date of termination of the continued patronage from the Lessor's customers on said Lunch Route or any new customers thereon whose patronage has been developed by Lessee, but he will be held liable for all loss suffered by Lessor as a consequence thereof. As liquidated damages for all such loss, Lessor shall be entitled to receive from Lessee the sum of Twenty-Five Hundred Dollars ($2,500.00) in addition to the security deposit above mentioned, and Lessee promises to pay the same upon demand."

the route, trying to sell to the same customers, for a week after he went out on his own. Gilbert testified that he cut prices for the food on the Chuck Wagon truck in half at one point, and that he offered free coffee at one place where Raduege was charging twenty cents per cup, and yet the customers still bought from Raduege. He also testified that at some plants the Chuck Wagon truck driver was told not to enter the company premises because Raduege was servicing them. Raduege was still servicing the route at the time of the trial.

Chuck Wagon's amended complaint against Raduege alleged breach of contract and tortious interference with contract. The trial court held that the list of customer stops which constituted the route Raduege serviced was not a trade secret, and that the restrictive covenant in the lease agreement between Chuck Wagon and Raduege was not necessary for the protection of Chuck Wagon since "any stranger would be fully able to acquire the information which was made available to the defendant." The trial court determined that Chuck Wagon was entitled to recover only the $189.82 for provisions purchased by Raduege on his final day of work for Chuck Wagon which is not challenged on appeal.

QUESTION #1: IS THE RESTRICTIVE COVENANT IN THE LUNCH WAGON ROUTE LEASING AGREEMENT ENFORCEABLE?

The trial court in its written decision said:

"Closely intertwined with the question of whether the employer has a protectable interest is the question of whether the paragraph purporting to prohibit the defendant from competing with the plaintiff is, in fact, an enforceable provision. The burden of proof is upon the plaintiff to show that any such restriction upon defendant's right to accept or to have similar employment after termination of the contract is, in fact, a reasonable requirement. The Court is of the opinion that the plaintiff has failed to meet this burden of proof. 55 Marquette

Law Review, 241, entitled 'Drafting and Enforcing Restrictive Covenants Not To Compete,' states that there are 5 separate elements, all of which must be met in order for the covenant to be enforceable. These five requirements are the necessity of the covenant for the employer's protection, the reasonableness of the territorial limitations provided, a showing that the covenant is not unreasonable to the employee, and a showing that the covenant is not unreasonable to the general public. *Lakeside Oil Company v. Slutsky*, 8 Wis. (2d) 157, states: 'An employer is not entitled to be protected against legitimate and ordinary competition of the type that a stranger could give.' Certainly the facts in this situation do not meet the standard set forth in Slutsky. As the Court indicated above, any stranger would be fully able to acquire the information which was made available to the defendant. Other standards as set forth are not followed and the Court need not discuss that any further.

"The Court then is of the opinion that a trade secret was not involved, and secondly, that the restrictive covenant is not enforceable."

In its Findings Of Fact, the court after having earlier quoted the restrictive covenant in the lease said:

"That whether or not a list of customers was furnished by plaintiff to defendant, such information as would be contained in a list of customers could be obtained by any individual who merely followed one of the plaintiff's vehicles and noted the stops made."

In its conclusions of law the trial court said:

"That the provision of the agreement between the parties hereinabove set forth, which purports to be a restrictive covenant, is an unreasonable restrictive covenant and is, therefore, unenforceable by the Court."

Nowhere does the trial court make any specific factual findings relating the evidence adduced at trial to the *Slutsky* criteria. The trial court concluded as a matter of law that the standards were not met without specific reference to the record.

Failure by the trial court to make findings of fact is not necessarily reversible error. *Hochgurtel v. San Felippo,* 78 Wis.2d 70, 86, 253 N.W.2d 526 (1977). As this court stated in *State ex rel. Skibinski v. Tadych,* 31 Wis.2d 189, 199, 142 N.W.2d 838 (1966), when there is a failure to make findings of fact, this court on appeal may adopt one of three courses: (1) Affirm the judgment if clearly supported by the preponderance of the evidence, (2) reverse if not so supported, or (3) remand for the making of findings and conclusions.

After reviewing the record, we conclude that the findings of fact are against the great weight and clear preponderance of the evidence, and that the *Slutsky* standards were not properly applied. Therefore, we reverse.

We conclude the restrictive agreement in this contract was enforceable subjecting the defendant to a claim for the liquidated damages provided for in the contract.

This court has consistently held that a list of customers per se does not constitute a trade secret. *Abbott Laboratories v. Norse Chemical Corp.,* 33 Wis.2d 445, 465–468, 147 N.W.2d 529 (1967) ; *American Welding & Engineering Co. v. Luebke,* 37 Wis.2d 697, 155 N.W.2d 576 (1968) ; *Gary Van Zeeland Talent, Inc. v. Sandas,* 84 Wis.2d 202, 267 N.W.2d 242 (1978). In *Abbott, supra,* the court held that names and addresses of customers which were easily ascertainable, or which were generally available to the trade do not constitute a trade secret. One of the factors relied upon in reaching that holding was that the defendant-salesperson in that case had developed no particular relationship with the customers on the list since these customers were not retail customers, they bought from several suppliers, and they bought on price and

quality rather than out of loyalty to any one salesperson. The court stated that, ". . . contact of a customer by a former employee is not as unfair as in the area of a route salesman whom customers know and have come to depend on." *Abbott Laboratories, supra,* 33 Wis.2d at 467.

In *Van Zeeland, supra,* the court held that a customer list containing only names and addresses without any information regarding customer needs or preferences was not a trade secret and not entitled to legal protection on that theory. The court's opinion again made a distinction between route and non-route salespeople.

"The typical and classical case of a route customer is the relationship between a householder and a milk delivery salesman. In that situation, the householder, during the course of the relationship, typically buys exclusively from the particular salesman; and it is assumed that, therefore, a special personal relationship will develop which will continue even though the salesman should commence his own enterprise or switch employers." 84 Wis.2d at 215.

The court noted that the defendant in that case did not qualify as a route salesperson since none of the customers on the list were dependent exclusively upon him, or even upon his agency for booking services.

In *Abbott* and *American Welding, supra,* the plaintiffs sought to enjoin the use of customer lists by former employees in the absence of restrictive covenants. In *Van Zeeland,* the restrictive covenant in the defendant's employment contract was held to be unenforceable on the ground that it was unreasonable as to both duration and territory.

In the case at bar there is a restrictive covenant involved. Sec. 103.465, Stats. 1975, states:

"103.465. **Restrictive covenants in employment contracts.** A covenant by an assistant, servant or agent not

to compete with his employer or principal during the time of the employment or agency, or thereafter, within a specified territory and during a specified time is lawful and enforceable only if the restrictions imposed are reasonably necessary for the protection of the employer or principal. . ."

Neither the statute nor Wisconsin case law requires that a business interest must qualify as a trade secret in order to support a covenant not to compete.

This court in *Lakeside Oil Co. v. Slutsky,* 8 Wis.2d 157, 98 N.W.2d 415 (1959), referred to the above quoted statute and set forth five basic requirements necessary to enforcement of a restrictive covenant. These are summarized in Richards, *Drafting And Enforcing Restrictive Covenants Not To Compete,* 55 Marquette Law Review, 241, 242 (1971–72). They are: (1) The agreement must be necessary for the protection of the employer or principal; (2) it must provide a reasonable time period; (3) it must cover a reasonable territory; (4) it must not be unreasonable as to the employee; and (5) it must not be unreasonable as to the general public.

The purpose of a covenant restraining an agent from competing with his principal after he leaves his principal's service is to prevent for a time the competitive use of information or contacts gained as a result of that service.[3] In many businesses the relationship with customers is the most valuable asset of the enterprise. In recognition of this fact, customer goodwill has been recognized as a property interest in and of itself.[4] Customer goodwill has value to the extent that a customer knows and feels he can rely upon the salesperson he is

---

[3] Blake, *Employee Agreements Not To Compete,* 73 Harv. L. Rev. 625, 647 (1960). (Hereinafter Blake.)

[4] *Old Dearborn Co. v. Seagram Corp.,* 299 U.S. 183, 194–95 (1936).

dealing with. In many cases a business's agent may be the sole contact customers have with that business.

"In any of these situations, the possibility is present that the customer will regard, or come to regard, the attributes of the employee as more important in his business dealings than any special qualities of the product or service of the employer, especially if the product is not greatly differentiated from others which are available. Thus, some customers may be persuaded, or even be very willing, to abandon the employer should the employee move to a competing organization or leave to set up a business of his own."[5]

In the case at bar, Raduege leased from Chuck Wagon a lunch route which Chuck Wagon had established and maintained as its own for six years. There was some testimony that Raduege added four or five stops to the original twenty-six stops on this route. Raduege serviced this route for two and one-half years as Chuck Wagon's agent. Over that period of time he had daily contact with the customers at each stop on the route. There was no evidence that any other catering service competed for customers at these stops. The products he sold were not unique.[6] His truck carried no name on it to indicate that he was working for anyone but himself. The record shows that customers remained loyal to him after he took the route for his own. Raduege argues that language in *Lakeside Oil Co. v. Slutsky, supra,* to the effect that employers may not be protected from competition of the type that a stranger could give precludes recovery in this case since anyone could observe where the Chuck Wagon trucks stopped and thereby learn who their customers were. This argument ignores the significant impact that

---

[5] *Blake, supra,* 73 Harv. L. Rev. at 654.

[6] Norman Gilbert testified at trial that "we are not gourmet specialist. We are selling sandwiches and a can of soda or a cup of coffee."

repeated and exclusive contact by a salesperson with a company's customers can have on customer loyalty. This Court stated in *Slutsky* that the protection of a business's stock of customers can be a legitimate interest of the employer. *Lakeside Oil Co. v. Slutsky*, 8 Wis.2d at 163. In that case the court upheld a restrictive covenant against a salesman who was his employer's main source of contact with his customers, and who sold his product at the customer's home or place of business rather than at the employer's place of business. Under the circumstances, the court stated, the employer had a ". . . great need for protection from the competition of his former employe." *Id.* at 164. Thus, the fact that anyone could determine who Chuck Wagon's customers were is not controlling in this case, since a stranger would not have the advantage of prior customer contacts that made Raduege's competition so harmful to Chuck Wagon's business.

Raduege argues that Chuck Wagon was able to compete on the route after defendant took it over. The evidence, however, points to the opposite conclusion. Gilbert testified that he sent his own trucks out on the route as soon as he learned that Raduege was servicing the route on his own. In some instances his drivers were not able to induce customers back from Raduege even though they offered their food at reduced prices. At one plant they attempted to give away coffee, yet customers preferred to pay twenty cents per cup for coffee they purchased from Raduege. This evidence is illustrative of the principle discussed in Flynn, *Trade Secrets, Customer Contacts And The Employer-Employee Relationship*, 37 Ind. L.J. 218, 231 (1961–1962).

"If there is no product differentiation . . . the incidental customer draw which the employee has developed from continued personal contact with the customer has a chance to play a part. If the milk route employee changes employers and begins delivering a different

brand of milk, the customer is likely to continue purchasing from him because of prior personal contact and the absence of factors permitting preference as to the brand of milk purchased. Thus where the court finds no product differentiation the employer has a protectable interest and the courts will enforce a restrictive covenant in an employment contract."

We conclude it was reasonable for Chuck Wagon to seek to protect its customer contacts by prohibiting Raduege from soliciting its former customers until its new drivers had an opportunity to become acquainted with the customers.

The covenant is reasonable as to duration and territory. The one year restriction is well within the rule established by *Eureka Laundry Co. v. Long,* 146 Wis. 205, 131 N.W. 412 (1911), and *Lakeside Oil Co. v. Slutsky,* 8 Wis.2d 157, 98 N.W.2d 415 (1959), that in Wisconsin a restrictive covenant protecting an employer's customer contacts in a situation of necessity will be enforced provided the restraint is reasonable. In those cases, two year restraints were held to be reasonable.

In Wisconsin a covenant is considered reasonable as to territory if, like this covenant, it is limited to the route or customers defendant actually services. *Slutsky, supra;* See also, *Union Central Life Ins. Co. v. Balistrieri,* 19 Wis.2d 265, 120 N.W.2d 126 (1963) ; *Wisconsin Ice & Coal Co. v. Lueth,* 213 Wis. 42, 250 N.W. 819 (1933).

In addition to requiring that the duration and territory of the covenant be reasonable, as required by statute, this court has required that the restriction from competition not be unreasonable as to the employee or the general public. *Slutsky, supra,* 8 Wis.2d at 157, 166. The testimony adduced at trial shows that the defendant in this case had experience in other lines of work. Moreover, the covenant does not prohibit him from working in the

mobile catering business altogether, but only from soliciting those customers he served while he was Chuck Wagon's lessee.

The covenant would not be unreasonable as to the general public since it does not create a shortage of employees or of this type of service, kill competition or create a monopoly. See *Slutsky, supra,* 8 Wis.2d at 157. Further, the evidence that Raduege had been employed steadily for at least the past seventeen years, plus the fact that he owns his own home indicated that it would not be likely that he would become dependent upon public assistance if he were restrained from working his former route. Cf., *Milwaukee Linen Supply v. Ring,* 210 Wis. 467, 471, 246 N.W. 567 (1933).

QUESTION #2: DID THE TRIAL COURT ERR IN CONCLUDING THAT NO CAUSE OF ACTION FOR INTENTIONAL INTERFERENCE WITH CONTRACT WAS PROVEN?

Chuck Wagon contends that Raduege's actions in leaving Chuck Wagon's service and servicing the lunch route on his own constituted tortious interference with contract. No evidence was adduced at trial which in any way indicated that Raduege's actions affected either other drivers currently in appellant's employ, or prospective lessees. The court did not err in concluding that no cause of action for intentional interference with contract was proven.

QUESTION #3: WAS THE TRIAL COURT'S FINDING THAT APPELLANT WAS ENTITLED TO NEITHER COMPENSATORY NOR PUNITIVE DAMAGES CLEARLY ERRONEOUS?

Chuck Wagon contends that the liquidated damages clauses in paragraph fifteen of the lease agreement

should not limit its recovery for damages resulting from Raduege's breach. The clause reads:

". . . [Lessee] will be held liable for all loss suffered by Lessor as a consequence . . . [of Lessee's competition on the route during the year following termination of the lease.] As liquidated damages for all such loss, Lessor shall be entitled to recover from Lessee the sum of twenty-five hundred dollars ($2,500.00) in addition to [a] security deposit . . ."

The contract is clear. Twenty-five hundred dollars is the agreed upon damages "for *all* such loss." There can be no compensatory damage in addition where the exact amount of damages is clearly spelled out.

In *Keehn v. United States Fidelity & Guaranty Co.,* 222 Wis. 410, 416, 268 N.W. 127 (1936), this court held that where parties have agreed on liquidated damages, recovery will be limited to the amount stipulated. Chuck Wagon's recovery must therefore be limited to the $2,500 stipulated to in the lease agreement as liquidated damages.

The $2,500 cannot be said to be an unreasonable estimate of damages since it closely approximates the total rent Chuck Wagon would have received for that route over the period of one year (250 working days times nine dollars per day equals $2,250), not counting the profit Chuck Wagon would have made from the sale of commodities to Raduege.

There is no merit to appellant's claim for punitive damages in this case. In *Entzminger v. Ford Motor Co.,* 47 Wis.2d 751, 757–58, 177 N.W.2d 899 (1970), this court pointed out that:

"Punitive damages are not allowed for a mere breach of contract, *White v. Benkowski,* 37 Wis.2d 285, 291, 155 N.W.2d 74 (1967); *Gordon v. Brewster,* 7 Wis. 309

(*355) (1858), or for all torts or for crimes but generally for those personal torts, which are malicious, outrageous or a wanton disregard of personal rights which require the added sanction of a punitive damage to deter others from committing acts against human dignity."

No such evidence was shown in this case.

The plaintiff, Chuck Wagon Catering, Inc., is entitled to judgment against the defendant, Raduege in the amount of $2,500, in addition to the $189.82 already awarded.

*By the Court.*—That part of the judgment awarding $189.82 to the plaintiff is affirmed. That part of the judgment denying recovery for breach of contract is reversed and remanded with directions to enter judgment for the plaintiff pursuant to this opinion.